## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL H. HOLLAND et al.,

      *Plaintiffs*,

    v.

CONSOL ENERGY INC. et al.,

      *Defendants*.

Civil Action No. 20-1148 (TJK)

## MEMORANDUM OPINION AND ORDER

Plaintiffs, trustees of the United Mine Workers of America 1992 Benefit Plan, sued eight energy-industry companies under the Coal Industry Retiree Health Benefit Act of 1992—the Coal Act, for short.  In their operative complaint, Plaintiffs seek a declaratory judgment that these companies are not fulfilling several of their obligations under the Coal Act and must do so.  Defendants move to dismiss, arguing that Plaintiffs failed to state a claim for relief.  For the following reasons, the Court disagrees, so it will deny Defendants' motions to dismiss.

## I.    Background

### A.    Statutory Framework

The circumstances precipitating the passage of the Coal Act[1] have been well-chronicled elsewhere.  *See generally Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 444–45 (2002); *E. Enters. v. Apfel*, 524 U.S. 498, 504–14 (1998) (plurality opinion); *Bellaire Corp. v. Shalala*, 995 F. Supp. 125, 127–30 (D.D.C. 1997).  Several provisions are relevant here.

---

[1] Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, §§ 19141–43, 106 Stat. 3036, 3036–56 (Oct. 24, 1992), *codified at* 26 U.S.C. §§ 9701–22.

First, § 9711 requires a "last signatory operator"—basically, any coal mining company that was the current or most-recent-former employer of a coal miner near the time Congress enacted the Coal Act and that was providing healthcare-benefits coverage to its employees—to continue providing that coverage to its retired employees and their dependents.  *See* 26 U.S.C. § 9701(b)(1), (c)(1), (c)(2), (c)(4); *id.* § 9711(a)–(c), (f).  The Court refers to such retired employees and their dependents as "beneficiaries."  The Coal Act also makes any "related person" of a last signatory operator jointly and severally liable for that obligation.  *See* § 9711(c)(1).  A "related person" is any one of three types of business affiliate of a last signatory operator, as well as a "successor in interest" to any such affiliate.  *See* § 9701(c)(2)(A).  For the three primary types of "related person," the requisite affiliation must have existed as of July 20, 1992.  *See* § 9701(c)(2)(B).  In contrast, the Coal Act does not specify any date by when "successor in interest" status must exist.  The obligation imposed by § 9711 lasts so long as the liable party remains "in business," which is broadly defined.  *Id.* §§ 9701(c)(7), 9711(a).

Second, § 9712 created a standalone healthcare-benefits plan known as the "United Mine Workers of America 1992 Benefit Plan" ("Plan").  *See* 26 U.S.C. § 9712(a)(1).  The Plan provides healthcare-benefits coverage to beneficiaries who do not receive the coverage to which they are entitled under § 9711 from a liable party.  *See* § 9712(b)(2)(B).  Section 9712 makes a "1988 last signatory operator[]"—effectively, a "last signatory operator" that was party to the 1988 National Bituminous Coal Wage Agreement—responsible for financing the healthcare-benefits coverage provided by the Plan.  *See* § 9712(d)(1); *see also* §§ 9701(c)(3), 9712(d)(6).  And it makes any "related person" to a 1988 last signatory operator jointly and severally liable for those financing responsibilities.  *See* § 9712(d)(4).  Those responsibilities include (1) paying a monthly per-beneficiary premium for each person receiving benefits from the Plan who should be receiving benefits

from the liable party's § 9711 plan but is not and (2) providing a security to the Plan for its projected future cost of furnishing healthcare-benefits coverage to the 1988 last signatory operator's beneficiaries. *See* § 9712(d)(1)(A)–(B). Thus, in essence, the Plan provides "backstop" coverage to beneficiaries who, for whatever reason, do not receive the coverage they have a right to receive under § 9711. *See Dist. 29, United Mine Workers of Am. v. United Mine Workers of Am. 1992 Ben. Plan*, 179 F.3d 141, 143 (4th Cir. 1999).

### B.    Corporate History

CNX Resources Corporation ("CNX") was incorporated in 1991 under the name Consol Energy Inc. *See* ECF No. 32 ¶¶ 1, 15. Plaintiffs allege that as of July 20, 1992, CNX "directly or indirectly owned 100%" of several coal mining subsidiaries, including (1) Consolidation Coal Sales Company, (2) Consol Sales Company, (3) Consolidation Coal Company of Canada, (4) Consolidation Coal Company of Kentucky, (5) Consol Pennsylvania Coal Company, (6) Wolfpen Knob Development Company, (7) Consolidation Coal Company, and (8) McElroy Coal Company. *See id.* ¶ 16.

The last two subsidiaries—Consolidation Coal Company and McElroy Coal Company— each were signatories to the 1988 National Bituminous Coal Wage Agreement, *see* ECF No. 32 ¶ 41, making them each a "[1988] last signatory operator." The Court refers to them as "Signatory Subsidiaries."

The first six subsidiaries later restructured and changed their names, as depicted in the table below:

| Old Name | Current Name |
| --- | --- |
| Consolidation Coal Sales Company | Consol Marine Terminals LLC |
| Consol Sales Company | Consol Energy Sales Company LLC |
| Consolidation Coal Company of Canada | Consol of Canada LLC |
| Consolidation Coal Company of Kentucky | Consol of Kentucky LLC |
| Consol Pennsylvania Coal Company | Consol Pennsylvania Coal Company LLC |
| Wolfpen Knob Development Company | Wolfpen Knob Development Company LLC |

*See* ECF No. 32 ¶¶ 20–25.  Plaintiffs do not allege that these entities were signatories to the 1988 National Bituminous Coal Wage Agreement, so the Court refers to these entities as "Non-Signatory Subsidiaries."

After Congress passed the Coal Act, CNX established a § 9711 plan for the Signatory Subsidiaries' beneficiaries.  *See* ECF No. 32 ¶ 52.  In December 2013, CNX sold the Signatory Subsidiaries to a subsidiary of Murray Energy Corporation under a stock purchase agreement.  *See id.* ¶ 53.  Murray Energy then established a § 9711 plan for those beneficiaries.  *See id.* ¶ 54.

Meanwhile, CNX—which, again, was "Consol Energy Inc." at the time—restructured.  In 2017, a new CNX subsidiary named Consol Mining Corporation was incorporated.  *See* ECF No. 32 ¶ 27.  Consol Mining Corporation then took ownership of the Non-Signatory Subsidiaries and spun off from CNX, assuming the name Consol Energy Inc.  *See id.* ¶¶ 28–29.  Simultaneously, CNX changed its name to CNX Resources Corporation.  *See id.* ¶ 15.

In 2019, Murray Energy filed for bankruptcy.  *See* ECF No. 32 ¶ 56.  During the bankruptcy proceedings, Murray Energy negotiated with its creditors to terminate its Coal Act obligations.

*See id.* ¶ 57.  Those negotiations resulted in a proposed settlement agreement by which Murray Energy would transfer its § 9711 plan members (including the Signatory Subsidiaries' beneficiaries) to the Plan and pay it about $12.5 million up front.  *See id.* (referencing ECF No. 38-1 at 9–10 ¶ 3(i)–(iii)).  A bankruptcy court approved the settlement, and the Plan enrolled the Signatory Subsidiaries' beneficiaries effective May 1, 2020.  *See id.* ¶¶ 58–60.

## C.    The Instant Lawsuit

The day after the Plan enrolled the Signatory Subsidiaries' beneficiaries, Plaintiffs Michael H. Holland, Joseph R. Reschini, and Carlo Tarley—trustees and thus "fiduciaries" of the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), *see* ECF No. 32 ¶ 2; 26 U.S.C. § 9712(a)(1); 29 U.S.C. § 1002(21)(A)—sued CNX and Consol Energy.  *See* ECF No. 1. They later added as defendants the six Non-Signatory Subsidiaries.  *See* ECF No. 32.  In their operative complaint, Plaintiffs allege that each defendant is a "related person" to the Signatory Subsidiaries and thus is jointly and severally liable for the Signatory Subsidiaries' obligations under § 9711 and § 9712.  *See id.*  Plaintiffs assert three counts for declaratory relief.  *See id.* ¶¶ 63–78.  CNX by itself, and Consol Energy together with the Non-Signatory Subsidiaries, have moved to dismiss.[2]  *See* ECF No. 37; ECF No. 42.

## II.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's complaint.  *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017).  To survive a motion to dismiss, a complaint must have facial plausibility, meaning it must plead factual content that allows a court to draw the reasonable inference that the defendant is liable for the

---

[2] The Court refers to Consol Energy together with the Non-Signatory Subsidiaries collectively as "Consol Energy Defendants."

misconduct alleged. *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). Generally, in evaluating a Rule 12(b)(6) motion, the Court must accept the complaint's factual allegations as true and grant the plaintiff the benefit of all inferences that flow from the facts alleged. *See id.*; *Perrow v. District of Columbia*, 435 F. Supp. 3d 9, 10–11 (D.D.C. 2020). But the Court need not accept inferences urged by the plaintiff if they are unsupported by the facts alleged, nor must the Court accept legal conclusions cast as factual allegations. *Hettinga*, 677 F.3d at 476. In considering a Rule 12(b)(6) motion, a court may consider the facts alleged in the complaint, any documents attached to or referenced in the complaint, and judicially noticeable matters. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Roggio v. FDIC*, No. 09-cv-1733 (TJK), 2020 WL 6270746, at *2 (D.D.C. Oct. 25, 2020).

## III.   Analysis

Plaintiffs assert three declaratory-judgment counts. *See* ECF No. 32 ¶¶ 63–78. Count I seeks a declaration that Defendants must set up a § 9711 plan for the Signatory Subsidiaries' beneficiaries. Count II seeks a declaration that Defendants must provide security for the Plan under § 9712(d)(1)(B). Count III seeks a declaration that Defendants must pay the monthly per-beneficiary premiums owed under § 9712(d)(1)(A), accruing from May 1, 2020 through the date Defendants set up a § 9711 plan for the Signatory Subsidiaries' beneficiaries.

Defendants argue that each Count fails to state a claim under Rule 12(b)(6).[3] *See* ECF No. 38 at 19–25; ECF No. 42-1 at 7–8. As for Count I, they argue that Plaintiffs lack a right of action

---

[3] They also move to dismiss, or in the alternative to stay, this case as unripe until Consol Energy's appeal from the bankruptcy-court order approving the Murray Energy settlement agreement is resolved. *See* ECF No. 37 at 2; ECF No. 42-1 at 7–8. That appeal has since been dismissed. *See In re Murray Energy Holdings Co.*, 624 B.R. 606, 608 (B.A.P. 6th Cir. 2021). Thus, this ripeness issue is now moot. *See In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993*, 720 F.3d 354, 359 (D.C. Cir. 2013); 13B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3532.7, n.5 & accompanying text (3d ed. Apr. 2021 update).

to sue to enforce Defendants' purported § 9711 obligations.  In the case of Count III, they contend that the $12.5 million that Murray Energy paid the Plan eliminates any current obligation they might have to pay premiums under § 9712(d)(1)(A).  Regarding Count II, they say that, with no present premium-payment obligations, they have no present security-payment obligations under § 9712(d)(1)(B).  Also, as for all counts, Consol Energy Defendants argue that Plaintiffs have not sufficiently alleged that any of them are a "related person."  *See* ECF No. 42-1 at 8–11.

### A.     Count I

Defendants first argue that Plaintiffs lack a right of action to sue to enforce Defendants' alleged § 9711 obligations.  Plaintiffs counter that they have either an express or an implied right of action under the Coal Act to bring Count I.  For the following reasons, the Court agrees that Plaintiffs possess an express right of action.

As with any statutory-interpretation issue, the Court starts with the language of the text. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).  Plaintiffs say that an express right of action flows from § 9721(1) of the Coal Act, which states that "[t]he provisions of section 4301 of [ERISA] shall apply, in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of title IV of such Act, to any claim . . . arising out of an obligation to pay any amount required to be paid by this chapter."  The text poses three interpretive questions: (1) whether Count I counts as "any claim"; (2) if so, whether that claim "aris[es] out of an obligation to pay any amount required to be paid by this chapter"; and (3) if so, whether "[t]he provisions of section 4301 of [ERISA] . . . apply" to create a right of action.  None of the key terms are defined in the relevant statutes, so the Court gives them their ordinary meaning.  *See, e.g., Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012).

First, Count I qualifies as "any claim." The word "any" has "an expansive meaning that usually indicates *one or some* indiscriminately of whatever kind." *See Del. Dep't of Nat Res. & Envtl. Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018) (cleaned up). And a "claim," in the legal sense of the word, means a "cause of action." *See* "Claim," *Black's Law Dictionary* (6th ed. 1990); *see also* "Claim," *Black's Law Dictionary* (11th ed. 2019) (defining "claim" to mean an "interest or remedy recognized at law"). Count I requests a declaratory judgment under 28 U.S.C. § 2201 over Defendants' § 9711 obligations, so it easily passes muster.

Second, the claim reflected in Count I arises out of an alleged obligation to pay any amount required to be paid by the chapter in question. A liable party's responsibility to establish and maintain a § 9711 plan is an "obligation"—that is, a "duty imposed by law." *See* "Obligation," *Black's Law Dictionary* (6th ed. 1990). The obligation is required by "this chapter," meaning Chapter 99 of Title 26, Subtitle J, containing the Coal Act, 26 U.S.C. §§ 9701–22. And a liable party's § 9711 responsibilities are obligations "to pay any amount required to be paid" by the Coal Act. Under § 9711, liable parties must pay to ensure that their beneficiaries receive the healthcare-benefits coverage to which the Coal Act entitles them. And Count I is self-evidently a claim "arising out of" those obligations.[4]

Defendants argue that the duties imposed by § 9711 are not obligations "to pay any amount required to be paid" by the Coal Act because a liable party under § 9711 does not pay the Plan but instead pays someone else—typically, an insurance company, a plan administrator, or both—to

---

[4] Although not limitless, "the phrase 'arising out of' is a broad one." *See Johansson v. Cent. Props., LLC*, 320 F. Supp. 3d 218, 225 (D.D.C. 2018). It denotes "a causal connection" and means to "originate or stem from" something else. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1260 (D.C. Cir. 2020) (cleaned up).

provide the required coverage.  But § 9721(1) is not limited to amounts required to be paid *directly* to the Plan.  Thus, there is no basis to give it the cramped reading Defendants urge.

*Holland v. Arch Coal, Inc.* confirms this interpretation.  *See* 947 F.3d 812 (D.C. Cir. 2020). There, the D.C. Circuit addressed whether the phrase "any amount required to be paid . . . under this section" in § 9712(d)(4) included the obligation to provide a security in § 9712(d)(1)(B).  *See Arch Coal*, 947 F.3d at 816.  The D.C. Circuit agreed with the district court that the ordinary meaning of payment— the "fulfillment of a promise, or the performance of an agreement," by furnishing "money or its equivalent"—was "more than capacious enough to encompass the provision of security."  *See Holland v. Arch Coal, Inc.*, 346 F. Supp. 3d 99, 106 (D.D.C. 2018), *aff'd*, 947 F.3d at 817.  That providing a security could take the form of an indirect payment—the liable party pays a bank, which in turn provides the security in the form required by § 9712(d)(1)(B)— made no difference.  *See Arch Coal*, 947 F.3d at 817.

So too here.  Just because establishing and maintaining a § 9711 plan may involve payments to third parties, that "does not mean that those payments are not 'required to be paid'" by the Coal Act.  *See Arch Coal*, 346 F. Supp. 3d at 106, *aff'd*, 947 F.3d at 817.  Rather, such payments still qualify as "any amount required to be paid."  *See id.*; *cf. Davis v. Buchanan Cnty.*, 5 F.4th 907, 909–10 (8th Cir. 2021) (construing "purchase" in a statute governing the procurement of liability insurance according to its plain meaning to include both direct and indirect acquisitions).

Third, "[t]he provisions of section 4301 of [ERISA] . . . apply" to create a right of action for Plaintiffs, although this phrase takes a little more unpacking.  Section 4301 of ERISA is codified at 29 U.S.C. § 1451.  *See Holland v. Williams Mountain Coal Co.*, 496 F.3d 670, 672 (D.C. Cir. 2007).  The relevant "cause of action" language is found in § 1451(a)(1).  *See Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1122 (D.C. Cir. 1989).  It states that a "plan fiduciary . . . who is

adversely affected by the act or omission of any party under this subtitle with respect to a mul-tiemployer plan . . . may bring an action for appropriate legal or equitable relief, or both."  29 U.S.C. § 1451(a)(1).  Here, Plaintiffs are the Plan's fiduciaries, so they meet that basic qualifica-tion to sue.  *See* ECF No. 32 ¶ 2; 29 U.S.C. § 1002(21)(A).  And for the below reasons, the Court finds that Plaintiffs are "adversely affected," and that Count I seeks "appropriate legal or equitable relief," such that they possess a right of action.

The phrase "adversely affected" has a "long history"; generally, it means to suffer an injury in fact in a way contemplated by the relevant statute.  *See Dir., Office of Workers' Compensation Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 126–27 (1995); *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 203 (1997).  In § 1451(a)(1) itself, the adverse effect must flow from "the act or omission of any party under this subtitle with respect to a multiemployer plan."  Thus, the harm with which that statute is concerned is "when the plan has not received payments which are due and owing" under the ERISA subtitle containing § 1451.  *See Joyce*, 871 F.2d at 1122.  In § 9721(1), the ad-verse effect must flow from a liable party's "obligation to pay any amount required to be paid" by the Coal Act.  Thus, the harm with which the Coal Act is concerned is when a liable party has not paid money it is required to pay under the Coal Act—including, as discussed above, its obligation to establish a § 9711 plan.

In other words, applying § 1451(a)(1) "in the same manner" here, Plaintiffs have a right of action so long as they are adversely affected by a liable party's failings with respect to any Coal Act payment obligations.  A liable party's failure to fulfill its § 9711 obligations inflicts on the Plan a classic injury in fact—a "palpable economic injur[y]"—because the Plan must provide backstop coverage under § 9712(b)(2)(B) in such circumstances.  *See Sierra Club v. Morton*, 405

U.S. 727, 732–34 (1972); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015).  Thus, as Plan fiduciaries, Plaintiffs are "adversely affected" for purposes of § 9721(1) when a liable party fails to fulfill its § 9711 obligations, and they may sue those parties.[5]

In doing so, they may seek declaratory relief because that is "appropriate legal or equitable relief."  On first blush that might seem surprising because, generally, "[a]ctions for declaratory judgment are neither legal nor equitable" per se.  *See Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988); *Am. Educ. Research Ass'n, Inc v. Public.Resource.Org, Inc.*, 78 F. Supp. 3d 542, 549 (D.D.C. 2015).  But at least in the ERISA context, "appropriate . . . equitable relief" has been read to include declaratory relief.  Thus, as explained below, the Court construes it similarly here.

The parties have cited no case in which a court considered whether declaratory relief is covered by § 1451(a)(1).  But courts *have* interpreted 29 U.S.C. § 1132(a)(3)(B), another right-of-action provision in ERISA, which permits suits for "appropriate equitable relief."  And, with the Supreme Court's apparent approval, they have read this phrase to permit "a cause of action for a declaratory judgment."  *See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 26–27 & n.31 (1983); *see also Dakotas & W. Minn. Elec. Indus. Health & Welfare Fund v. First Agency, Inc.*, 865 F.3d 1098, 1102–04 (8th Cir. 2017); *Cognetta v. Bonavita*, 330 F. Supp. 3d 797, 805–11 (E.D.N.Y. 2018).

---

[5] Defendants rely on *Holland v. Consol Energy, Inc.* to argue that the Plan's fiduciaries may not bring suit under § 9721(1) to enforce a liable party's § 9711 obligations.  *See* 781 F. App'x 209 (4th Cir. 2019).  They point to the court's observation in that case that "[t]o the extent § 9711 creates statutory rights, they belong to the beneficiaries who would be denied coverage," suggesting that the Plan lacked a "cognizable injury" flowing from a liable party's failure to fulfill its § 9711 obligations.  *Id.* at 213.  This dictum is unpersuasive.  For starters, the court did not cite, let alone analyze, § 9721(1) and § 1451(a)(1).  Further, in the very next paragraph, the court suggested that the Plan's duties under § 9712(b)(2)(B) could very well be a "legally cognizable injury" when triggered by a liable party's § 9711-related failures.  *See* 781 F. App'x at 213.

Granted, even after *Construction Laborers Vacation Trust*, federal courts "are not uniform" on this point. *See* 27 *Fed. Proc., L. Ed.*, § 61:379 (Mar. 2022 update). But the majority approach is that "declaratory relief constitutes 'appropriate equitable relief'" under § 1132(a)(3)(B). *See* Thomas H. Lawrence & John M. Russell, "Chapter 3: Initiating the Action," *ERISA Subrogation*, at n.72 & accompanying text (ABA 2000) (collecting authorities). Without binding authority to the contrary, the Court follows the majority approach to read "appropriate equitable relief" in § 1132(a)(3)(B) to include declaratory relief.[6]

From there, it is a short step back to § 1451(a)(1), which permits "appropriate legal or equitable relief." Given the similar phrasing of § 1132(a)(3)(B) and § 1451(a)(1), they should be read to "have the same meaning" unless context dictates otherwise. *See Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 276 (D.C. Cir. 2009). The Court sees nothing in the context of § 1451(a)(1) to construe "appropriate . . . equitable relief" there differently than "appropriate equitable relief" in § 1132(a)(3)(B). Thus, § 1451(a)(1), and in turn the Coal Act's § 9721(1), permits a plan fiduciary to "bring a declaratory judgment action." *See Franchise Tax Bd. of Cal.*, 463 U.S. at 26–27.

\*     \*     \*

In summary, Plaintiffs are plan fiduciaries authorized to sue on behalf of the Plan. Count I qualifies as "any claim," so Plaintiffs may bring it. Count I is also a claim "arising out of an

---

[6] The Court notes that the minority approach to § 1132(a)(3)(B) would not dictate a contrary result in this case. The cases in the minority, following the general principle that "declaratory judgment claims . . . are defined by the underlying issues in the case," *Am. Educ. Research Ass'n*, 78 F. Supp. 3d at 549, have looked past the "declaratory judgment" label, determined that the nature of the claim was legal rather than equitable, and then held accordingly that the declaratory relief sought in the case was not "appropriate equitable relief." *See, e.g.*, *Gulf Life Ins. v. Arnold*, 809 F.2d 1520, 1523 (11th Cir. 1987); *Transamerica Occidental Life Ins. v. DiGregorio*, 811 F.2d 1249, 1251–52 (9th Cir. 1987). But because § 1451(a)(1) provides for "appropriate *legal or* equitable relief," following this approach would make no difference here because both forms of relief are available. § 1451(a)(1) (emphasis added).

obligation to pay any amount required to be paid" by the Coal Act because it stems from Defendants' failure to fulfill their alleged § 9711 obligations.  Plaintiffs may bring this claim because Defendants' failure to fulfill their § 9711 obligations has "adversely affected" the Plan under the Coal Act.  And Plaintiffs' request for declaratory relief qualifies as "appropriate legal or equitable relief."  Thus, Plaintiffs have an express right of action under § 9721(1) to bring Count I.  For that reason, Defendants' Rule 12(b)(6) challenge to this count fails.

     **B.**    **Count III**

     Defendants next argue that Count III should be dismissed because the $12.5 million Murray Energy paid the Plan reduces any liability Defendants might have to the Plan under § 9712(d)(1)(A) to pay monthly per-beneficiary premiums.  Defendants' argument is based on the principle that, where parties are jointly and severally liable for a claim, a plaintiff's recovery from one party reduces the amount the plaintiff may recover from the other parties.  *See United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 26–27 (D.D.C. 2004); *see also Kaplowitz v. Kay*, 70 F.2d 782, 782–83 (D.C. Cir. 1934); *cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348 (1971) (applying this principle as between "coconspirator[s]").  But even assuming they are right and this principle applies here, it does not justify dismissal.  *Cf. Arch Coal*, 947 F.3d at 820 (acknowledging but sidestepping the argument that if a Coal Act "obligation has been satisfied by or on behalf of one of the jointly liable parties, then it cannot be demanded from another").

     In substance, Defendants argue that their affirmative defense of payment warrants dismissal of Count III.  *See generally* Fed. R. Civ. P. 8(c)(1); 1 *Bus. & Commercial Litig. in Fed. Cts.* § 9:71 (Robert L. Haig, ed., 5th ed. Dec. 2021 update); *Restatement (Second) of Judgments* § 50 (Am. L. Inst. 1982).  But a claim may be dismissed based on an affirmative defense at the Rule 12(b)(6) stage only when: (1) facts that establish the defense are "definitively ascertainable" from

the complaint's allegations, from any incorporated documents, or from judicially noticeable material; (2) those facts "conclusively establish" the defense; and (3) the affirmative defense completely bars the claim. *See* 61A *Am. Jur. 2d Pleading* § 480 (Feb. 2022 update); 27A *Fed. Proc., L. Ed.* § 62:465, nn.15–17 & accompanying text (Mar. 2022 update); *ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211, 216–17 (D.D.C. 2013); *cf. Keiser v. Walsh*, 118 F.2d 13, 14 (D.C. Cir. 1941) ("We need not consider whether appellant has asked for the proper relief. . . . [A] complaint is sufficient if it sets forth facts which show that the plaintiff is entitled to *any relief* which the court can grant." (emphasis added)).  The party seeking dismissal on such basis has the burden of proving it. *See, e.g.*, *Bradford v. George Wash. Univ.*, 249 F. Supp. 3d 325, 334 (D.D.C. 2017).

Defendants have not done so.  Even if the $12.5 million settlement payment reduces Defendants' liability under § 9712(d)(1)(A), Defendants have not "conclusively established" that the payment will satisfy in full Defendants' alleged liability to the Plan for monthly per-beneficiary premiums.  Indeed, they do not even claim as much—instead, they assert merely that the Plan "may" never need more than that amount to provide benefits to the Signatory Subsidiaries' beneficiaries. *See* ECF No. 38 at 25.  Thus, this argument provides no reason to dismiss Count III.

### C.    Count II

Defendants also argue that Count II should be dismissed because, without a current obligation to pay monthly per-beneficiary premiums thanks to the Murray Energy settlement payment, they "necessarily are not required to provide any security" under § 9712(d)(1)(B) at this time because they "have no current obligations to be secured."  Defendants do not develop this argument any further or cite supporting authority for the proposition that a liable party's obligation to provide security depends on that party's present obligation to pay monthly per-beneficiary premiums.

Thus, the Court will not consider it.  *See, e.g.*, *Nat'l Fair Housing Alliance v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 34 n.4 (D.D.C. 2017).

    **D.**       **Counts I–III and Plaintiffs' "Related Person" Allegations**

        Consol Energy Defendants also move to dismiss all three counts because Plaintiffs purportedly failed to adequately allege that any of them are "related persons" to the Signatory Subsidiaries.  Plaintiffs assert different bases for alleging that the Non-Signatory Subsidiaries are "related persons" and that Consol Energy is a "related person."  As for the Non-Signatory Subsidiaries, Plaintiffs allege that they qualify either because they each were (1) a "member of the controlled group of corporations" that included the Signatory Subsidiaries as of July 20, 1992, § 9701(c)(2)(A)(i), or (2) a "trade or business . . . under common control" with the Signatory Subsidiaries at that time, § 9701(c)(2)(A)(ii).  *See* ECF No. 32 ¶¶ 16, 43–48.  As for Consol Energy, Plaintiffs assert that it qualifies because it is a successor in interest under § 9701(c)(2) to a "related person," and thus a "related person" as well.  *See* ECF No. 32 ¶¶ 49–50.

        So long as any of these alternative routes to "related person" status for each of these defendants is supported by factual allegations that make that alternative plausible, Plaintiffs have stated a claim that they each qualify as "related persons."  *See* Fed. R. Civ. P. 8(d)(2); *Keiser*, 118 F.2d at 13; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 n.10 (9th Cir. 2012) (en banc).  Plaintiffs' allegations clear this hurdle.

        **1.**       **"Related Person" Status of Non-Signatory Subsidiaries**

        As for the Non-Signatory Subsidiaries, one of the alternatives Plaintiffs assert is that these entities each were "under common control" with the Signatory Subsidiaries as of July 20, 1992, making them "related persons" under § 9701(c)(2)(A)(ii).  In support of this assertion, Plaintiffs allege that each of the Signatory and Non-Signatory Subsidiaries existed on July 20, 1992 and that

at that time CNX "directly . . . owned 100%" of each of them.  *See* ECF No. 32 ¶¶ 16–25.  Sparse as they are, these factual allegations suffice.

Under § 9701(c)(2)(A)(ii), each Non-Signatory Subsidiary qualifies as a "related person" to a Signatory Subsidiary if, as of July 20, 1992, it was a "trade or business . . . under common control (as determined under [26 U.S.C. § 52(b)] with" a Signatory Subsidiary.  Section 52(b), in turn, references regulations prescribed by the Treasury Secretary to determine what constitutes "common control."  In 1992, those regulations were codified at 26 C.F.R. § 1.414(c)-2.  They specified several types of "common control" groups, including a "parent-subsidiary" common-control group.  *See* 26 C.F.R. § 1.414(c)-2(a).  This "parent-subsidiary group" consisted of

> one or more chains of organizations conducting trades or business connected through ownership of a controlling interest with a common parent organization if . . . (i) [a] controlling interest in each of the organizations, except the common parent organization, is owned (directly . . . ) by one or more of the other organizations; and (ii) [t]he common parent organization owns (directly . . . ) a controlling interest in at least one of the other organizations . . . .

*Id.* § 1.414(c)-2(b)(1).  A corporation's "controlling interest" in another organization meant, in essence, ownership of at least 80% of the other organization's stock.  *Id.* § 1.414(c)-2(b)(2)(i)(A).  When such features were present, then a "parent-subsidiary group of trades or businesses under common control" existed, consisting of the parent and the subsidiaries.  *See, e.g.*, *id.* § 1.414(c)-2(e) (providing illustrations).

Plaintiffs allege sufficient facts to plausibly state that a "parent-subsidiary group" existed on July 20, 1992 that included the Signatory and Non-Signatory Subsidiaries.  Again, Plaintiffs plead that at that time CNX directly owned 100% of each of these entities, making CNX the qualifying parent and each of these entities qualifying subsidiaries in the "parent-subsidiary" common-control group.  The alleged "parent-subsidiary group" that existed on July 20, 1992 makes each

Non-Signatory Subsidiary a "trade or business . . . under common control" with each Signatory Subsidiary, and thus a "related person" under § 9701(c)(2)(A)(ii).

### 2.   "Related Person" Status of Consol Energy

As for Consol Energy, one of the alternatives Plaintiffs assert is that it is a "successor in interest" "related person" under § 9701(c)(2) because it became the Non-Signatory Subsidiaries' "direct . . . owner" when CNX created Consol Energy and gave it ownership of these entities in 2017. *See* ECF No. 32 ¶¶ 15, 27–30, 49–50. Here as well, these modest factual allegations suffice.

The Coal Act does not define "successor in interest." That said, the D.C. Circuit has analyzed the meaning of "successor in interest" in § 9711(g)(1). *See Holland v. Williams Mountain Coal Co.*, 256 F.3d 819 (D.C. Cir. 2001). There, the parties presented the court with three alternatives for what constituted a "successor in interest": a broad "substantial continuity of operations test," a narrower "general corporate definition," and any one of several narrower "special tax definitions." *See id.* at 826. The court rejected the "substantial continuity of operations test." *See id.* Doing so resolved the appeal, so the court did not need to decide whether the "general corporate definition" or one of the "special tax definitions" governed. *See id.* Even so, it noted that under each of these two tests "the 'successor in interest' is a successor to the *wealth* of the predecessor, typically through a corporate reorganization." *Id.* at 822; *see also* "Successor in Interest," *Black's Law Dictionary* (6th ed. 1990) (defining "successor in interest" to mean "[o]ne who follows another in ownership or control" and retains "the same rights" as the previous owner such that the change is effectively "in form only and not in substance").

Plaintiffs' factual allegations make it plausible that Consol Energy succeeded to the wealth of CNX through a corporate reorganization by which Consol Energy took over complete ownership of the Non-Signatory Subsidiaries in what amounted to a change in form but not in substance.

*See* ECF No. 32 ¶¶ 15, 27–30, 49–50.  Consol Energy does not argue that Plaintiffs needed to plead more than that.  For instance, it does not argue for one of the two alternative definitions raised in *Williams Mountain Coal Co.* and contend that Plaintiffs' allegations fail under that definition.  Thus, the Court finds that Plaintiffs have sufficiently alleged that Consol Energy qualifies as a "successor in interest" "related person" under § 9701(c)(2)(A).

Consol Energy *does* argue that it cannot be a "successor in interest" "related person" because it did not exist on July 20, 1992.  But on this point, Consol Energy misconstrues the Coal Act.

The Coal Act specifies four types of "related person": three are enumerated in clauses (i), (ii), and (iii) of § 9701(c)(2)(A), and the fourth is "a successor in interest of any person described in clause (i), (ii), or (iii)."  *See* § 9701(c)(2)(A).  In the very next provision, the Coal Act then specifies that "[t]he relationships *described in clauses (i), (ii), and (iii) of subparagraph (A)* shall be determined as of July 20, 1992."  § 9701(c)(2)(B) (emphasis added).  The statute says nothing about a date for determining "successor in interest" "related person" status.  Where, as here, "Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—the [Court] presumes that Congress intended a difference in meaning." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) (cleaned up).  Thus, the "related person" statuses in clauses (i) through (iii) are determined as of July 20, 1992, but the "successor in interest" "related person" status is not determined as of that date.

Consol Energy suggests no other cutoff date that would defeat its "successor in interest" "related person" status.  Thus, even though Consol Energy did not exist until 2017, it still may qualify as a "successor in interest" "related person" as described above.

**IV.**     **Conclusion and Order**

For all these reasons, it is hereby **ORDERED** that CNX's Motion to Dismiss Plaintiffs'
Second Amended Complaint or, in the Alternative, to Stay, ECF No. 37, is **DENIED**.  It is further
**ORDERED** that Consol Energy Defendants' Amended Motion to Dismiss Plaintiffs' Second
Amended Complaint, ECF No. 42, is **DENIED**.  It is further **ORDERED** that Defendants shall
answer Plaintiffs' Second Amended Complaint, ECF No. 32, by April 22, 2022.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 29, 2022