**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL BUCKNER et al.,

        *Plaintiffs*,

    v.

CONSOL ENERGY INC. et al.,

        *Defendants and*
        *Third-Party Plaintiffs*,
    v.

E.I. DU PONT DE NEMOURS AND COM-
PANY et al.,

        *Third-Party Defendants.*

Civil Action No. 20-1148 (TJK)

<u>**MEMORANDUM OPINION AND ORDER**</u>

      Plaintiffs are trustees of the United Mine Workers of America 1992 Benefit Plan.  They seek a declaratory judgment that Defendants—eight energy-industry companies—are failing to fulfill their obligations to the plan under the Coal Act.  Plaintiffs argue that Defendants are liable for these obligations because Defendants are related to entities that are signatories to certain collective bargaining agreements within the coal industry.  Defendants, in turn, sued Third-Party Defendants, claiming that if Defendants are liable for these obligations, then these other parties are as well because they are similarly related to those same signatories.

      Third-Party Defendants move to dismiss Defendants' complaint against them.  They argue the Court lacks subject-matter jurisdiction, Defendants have failed to state a claim, and that the complaint against them is procedurally defective.  The Court finds that it has subject-matter jurisdiction.  But it also finds that Defendants have failed to state a claim because Third-Party Defendants are insufficiently related to the corporate entity signatories to incur liability under the Coal

Act.  Thus, the Court will grant their motions and dismiss the Third-Party Complaint against them.

**I.      Background**

**A.      Legal Background**

The Coal Act's comprehensive liability scheme "provides health benefits to coal industry retirees."  *See generally Holland ex rel. UMWA 1992 Benefit Plan v. Arch Coal, Inc.*, 947 F.3d 812, 814 (D.C. Cir. 2020).[1]  It does so in several ways.  First, it creates a combined fund to benefit industry members who were entitled to benefits under collective-bargaining agreements operative at the time of its enactment.  *See id.*; 26 U.S.C. § 9703(e).  Second, it imposes certain obligations on coal companies.  One of those obligations is that employers who offered "independent employer plans" ("IEPs") at the time of the Act's enactment must keep doing so.  *See Arch Coal*, 947 F.3d at 814; 26 U.S.C. §§ 9711, 9712(b).  This requirement continues "for as long as the [company] remains in business."  26 U.S.C. § 9711.

The Coal Act also created the UMWA 1992 Benefit Plan ("the Plan") as a standalone healthcare-benefits plan.  *See Arch Coal*, 947 F.3d at 814.  The Plan serves those "not covered" by either the combined fund or an IEP.  *See id.*  In that sense, it is a coverage "backstop."  *See Dist. 29, United Mine Workers of Am. v. United Mine Workers of Am. 1992 Benefit Plan*, 179 F.3d 141, 143 (4th Cir. 1999).  In ERISA terms, it is a multiemployer employee welfare benefit plan.  *See* 26 U.S.C. § 9712(a)(2)(B)–(C); 29 U.S.C. §§ 1002(1), 1002(37).[2]

The Plan collects premiums for its beneficiaries from coal-industry employers and their successors.  *See Holland v. Bibeau Constr. Co.*, 774 F.3d 8, 11 (D.C. Cir. 2014).  Thus, if an

---

[1] Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, §§ 19141–43, 106 Stat. 3036, 3036–56 (Oct. 24, 1992), codified at 26 U.S.C. §§ 9701–22.

[2] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

employer's qualifying retirees are enrolled in the Plan, then the employer incurs three forms of liability.  First, it must pay "a monthly per beneficiary premium."  *See* 26 U.S.C. § 9712(d)(1)(A).  Second, it must provide security in the amount of their portions of the "projected future cost . . . of providing health benefits for eligible and potentially eligible beneficiaries."  *See id.* § 9712(d)(1)(B).  Third—but conditional on the operation of another statute—it must pay "an additional backstop premium" calculated by reference to their obligations under the other statute.  *See id.* § 9712(d)(1)(C); *Arch Coal.*, 947 F.3d at 814; *see also* 30 U.S.C. § 1232.  Companies obligated to contribute to the Plan are "jointly and severally liable" for those amounts.  *See* 26 U.S.C. § 9712(d)(4).

The above-described obligations are imposed by the Coal Act on two types of entities.  *See Arch Coal*, 947 F.3d at 814.  The first are "last signatory operators."  A last signatory operator is an entity that was party to a collective bargaining agreement effective when the Coal Act was enacted, *id.*, and is "the most recent coal industry employer of [a] retiree."  26 U.S.C. § 9701(c)(4); *see also id.* §§ 9712(d)(1), 9712(d)(6).  The second are entities "related . . . to a [last] signatory operator."  *See* 26 U.S.C. § 9701(c)(2).  Whether an entity qualifies as "related" is assessed "as of July 20, 1992" according to statutory criteria discussed below.  *See id.*

### B.    Factual Background

The relationships between the various entities is central to the Court's resolution of the instant motions.[3]  The Third-Party Complaint names as Third-Party Defendants (1) E. I. du Pont de Nemours and Company ("EID") and (2) three German companies that the Court will

---

[3] The Court presumes these allegations in the operative complaints to be true.

collectively call "RWE."[4]  In 1981, EID acquired a 100% interest in Consolidation Coal Company ("Consolidation")—the company at the center of this dispute—through one of its subsidiaries. ECF No. 82 ¶¶ 27–29, 31.  And in 1988, while it was still owned by EID, Consolidation signed a qualifying collective bargaining agreement, thus becoming a last signatory operator with corresponding obligations under the Coal Act.  ECF No. 82 ¶ 30; ECF No. 32 ¶ 26.

In 1991, EID sold 50% of its interest in Consolidation "to form a joint venture with" RWE. ECF No. 82 ¶ 31.  The joint venture was incorporated under the name CONSOL Energy Inc. ("Old CONSOL"),[5] and in that process, Consolidation became a wholly owned subsidiary of the Old CONSOL joint venture.  *Id.* ¶ 32.  Thus, as of July 20, 1992—the date relevant for determining "related persons"—Consolidation was owned by Old CONSOL.  *See id.* ¶¶ 46–48.

Old CONSOL lasted as a joint venture for about seven years.  ECF No. 82 ¶¶ 32–34.  Between 1998 and 1999, EID sold its interest in Old CONSOL to RWE, which then owned 94% of the venture.  *Id.* ¶ 33.  And shortly after, Old CONSOL went public, terminating the joint venture. *Id.* ¶ 34.

In 2013, Old CONSOL sold Consolidation to Ohio Valley Resources, Inc. in a stock-purchase agreement.  ECF No. 82 ¶ 38; ECF No. 32 ¶ 53.  Ohio Valley was then a wholly owned subsidiary of Murray Energy Corporation.  ECF No. 32 ¶ 53.  A few years later, in 2017, Old CONSOL split into two new entities.  ECF No. 82 ¶ 39.  Part of it was spun off into a new corporate entity called CONSOL, and the remainder became CNX Resources Corporation.  *Id.*  These two entities—CONSOL and CNX Resources Corporation—along with six of CONSOL's

---

[4] These companies are RWE A.G., Rheinbraun A.G. (now RWE Power A.G.), and Rheinbraun U.S. GmbH (now RWE Power A.G.).

[5] The Court uses this name to distinguish Old CONSOL from the named defendant CONSOL, a later spinoff of Old CONSOL's subsidiary CONSOL Mining Corp.  ECF No. 82 ¶ 39.  At the time of that spinoff, Old CONSOL changed its name to CNX.  *Id.*

subsidiaries—are now Defendants/Third-Party Plaintiffs in this case.  *See* ECF No. 32 ¶¶ 5–12.

When Consolidation was sold to Murray Energy Corporation (through its subsidiary: Ohio Valley Resources), the stock-purchase agreement and the Coal Act required Murray Energy Corporation to pay benefits to Consolidation's eligible retirees through an IEP.  ECF No. 82 ¶ 38; ECF No. 32 ¶ 54.  But Murray Energy Corporation and 98 of its affiliates filed for Chapter 11 bankruptcy in 2019, which caused about 1,600 beneficiaries to be transferred to the Plan.  *See* ECF No. 32 ¶¶ 56–57, 60.  Because those beneficiaries were transferred to the Plan, Consolidation (as the last signatory operator) and "related persons" to Consolidation, then became obligated to contribute to the Plan under the Coal Act.  *Id.* ¶ 77.

### C.    Procedural History

In August 2020, Plaintiffs sued Defendants—CONSOL, six of its subsidiaries, and CNX— as the corporate split-offs from Old CONSOL, arguing that they are "related persons" to Consolidation and are therefore jointly and severally liable for Consolidation's obligations under the Coal Act.[6]  *See* ECF No. 32 ¶¶ 1, 41–62, 65, 67, 70, 74–75, 78.  Specifically, they argue that Defendants are obligated to (1) establish an IEP for the qualifying beneficiaries; (2) provide security to the Plan as set forth in Section 9712(d)(1)(B); and (3) pay the monthly per beneficiary premiums to the Plan for the beneficiaries who were transferred to it after the Murray Energy bankruptcy.  *See id.* ¶¶ 63–78.  Defendants moved to dismiss for failure to state a claim, ECF Nos. 37, 42, but the Court denied those motions after concluding that the alleged corporate relationships were sufficient under the statutory criteria, ECF No. 65 at 15–19.

Defendants then filed the Third-Party Complaint against EID and RWE.  *See* ECF No. 82

---

[6] Plaintiffs also allege that Defendants are liable for contributions as "related persons" to McElroy Coal Company, another last signatory operator under the Coal Act that was owned by Old CONSOL on July 20, 1992.  ECF No. 82 ¶ 41.

¶¶ 14–17.  Defendants contend that because EID and RWE "were members or owners of a joint venture that owned and operated Old CONSOL and its subsidiaries, including [Consolidation]," *id.* ¶ 46, they are also "related persons" to Consolidation.  Thus, Defendants allege, if they are jointly and severally liable to Plaintiffs for Consolidation's obligations, then EID and RWE are also jointly and severally liable for those same obligations. *Id.* ¶ 47.  EID and RWE now separately move to dismiss the Third-Party Complaint.  ECF Nos. 95 & 112.  They collectively argue that the Court lacks jurisdiction and that the Third-Party Complaint fails to state a claim and is procedurally improper.  Defendants oppose both motions. *See* ECF Nos. 102, 123.  Plaintiffs also responded to the motions for the limited purpose of establishing jurisdiction by arguing that they have standing to bring their claims.  ECF No. 101.

## II.  Legal Standards

A party invoking the Court's subject-matter jurisdiction has the burden to establish it.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Thus, a party asserting a claim must demonstrate standing.  *Little v. Fenty*, 689 F. Supp. 2d 163, 166–67 (D.D.C. 2010).  That burden "grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).  To survive a motion to dismiss, claimants need only allege a qualifying "injury resulting from [the defendants'] conduct." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  The Court must "assume the truth of all material factual allegations in the complaint and . . . grant[ ] [the claimants] the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).

Still, factual allegations demand "closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion." *Tex. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 52 (D.D.C. 2019) (quotation omitted).  The Court cannot "accept inferences

drawn by plaintiffs if such inferences are unsupported by the facts." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quotation omitted). The Court may consider the allegations in the complaint, undisputed facts in the record, and, if necessary, its resolution of disputed facts. *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). The party with the burden to establish jurisdiction must do so "by a preponderance of the evidence." *See Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011).

Under Rule 12(b)(6), a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A claim is plausible if "it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quotation omitted). Again, the Court must "accept all the well-pleaded factual allegations . . . as true and draw all reasonable inferences from those allegations in [the claimant's] favor." *Id.* (quotation omitted). But it must disregard "a legal conclusion couched as a factual allegation." *See Trudeau*, 456 F.3d at 193.

## III.  Analysis

EID and RWE collectively assert three grounds for dismissal. First, they contest the Court's subject-matter jurisdiction, arguing that there is no concrete injury, any injury that might exist was self-inflicted, and that Defendants' claims are unripe. *See* ECF No. 95-1 at 25–30; ECF No. 112-1 at 15–16. Second, under Rule 12(b)(6), they argue that Defendants have not alleged facts establishing that they are "related persons" under the Coal Act. *See* ECF No. 95-1 at 40–45; ECF No. 112-1 at 24–28. Third, under Rule 14, RWE contends that it was improperly impleaded. ECF No. 112-1 at 16–23.

The Court finds that Plaintiffs plausibly allege a financial injury that is not self-inflicted,

and that Defendants' third-party claims are constitutionally ripe.  Thus, the Court has subject-matter jurisdiction over their claims.  That said, because the Court finds that EID and RWE are not "related persons" under the Coal Act, it will grant their motions to dismiss.

### A.    The Court Has Subject-Matter Jurisdiction

As explained above, EID and RWE raise three jurisdictional challenges.  First, EID challenges the concreteness of Plaintiffs' asserted injury, arguing that it has been nullified by a recent congressional funding guarantee.  *See* ECF No. 95-1 at 25–29.  Second, EID suggests that any injury Plaintiffs have suffered is self-inflicted.  *See id.* at 29–30.  Third, RWE contends that Defendants' third-party claim is not constitutionally ripe.  *See* ECF No. 112-1 at 15–16.  As explained below, none of their challenges succeed.

### 1.    Plaintiffs Allege an Injury-In-Fact

To show standing at the pleading stage, Plaintiffs must "clearly allege facts demonstrating" they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration adopted).  EID's challenge focuses on the first prong by arguing that Plaintiffs have suffered no real injury.[7]

An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  These requirements are the "irreducible constitutional minimum of standing" and cannot be displaced by statute.  *See Lujan*, 504 U.S. at 560.  Thus, a plaintiff does

---

[7] EID does not challenge Plaintiffs' showing on either the traceability or the redressability prongs of the standing inquiry, and the Court finds those prongs satisfied.  Of course, Defendants' failure to pay their alleged financial obligations is traceable to them.  And a declaratory judgment that establishes financial rights and duties would substantially redress Plaintiffs' financial injury. *See, e.g.*, *Phila. Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1335–36 (10th Cir. 2017).

not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants [it a] statutory right and purports to authorize [it] to sue." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Robins*, 578 U.S. at 341).[8]

An injury is concrete if it is "real, and not abstract," *Robins*, 578 U.S. at 340 (quotations omitted), and is particular if it "affects the party asserting standing 'in a personal and individual way,'" *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (quoting *Lujan*, 504 U.S. at 560 n.1). As for imminence, because Plaintiffs seek prospective relief in the form of a declaratory judgment, they must show an "ongoing or future injury." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Two alternative tests assess the imminence of future injuries; satisfying either is enough to allege an injury-in-fact. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626–27 (D.C. Cir. 2017). The first asks whether a "threatened injury" is "certainly impending," rather than merely "possible." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotations and emphasis omitted). And the second test asks whether "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted).

Additionally, standing "is not dispensed in gross"; instead, it must be evaluated for "each claim [a plaintiff] seeks to press." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotations omitted). Plaintiffs assert three claims. Count One asks for Defendants to establish IEPs; Count Two asks for Defendants to pay securities to the Plan; and Count Three asks for Defendants to pay the Plan premiums. EID appears to paint with a broad brush, arguing that Plaintiffs "have no concrete stake in the litigation." ECF No. 95-1 at 26. But as explained below, their primary argument rests on the fact that Congress has provided funding sufficient for the Plan to meet its obligations

---

[8] For this reason, the Court's prior determination that Plaintiffs' operative complaint states a claim under the Coal Act does not automatically resolve the constitutional standing question. *See* ECF No. 65 at 10–11; *contra* ECF No. 102 at 11–12.

irrespective of the premiums it receives. Only Count Three, however, relates to the payment of premiums. *See* ECF No. 32 ¶¶ 76–78. EID provides no good explanation as to how the congressional funding would redress the unique monetary, administrative, and other harms stemming from Counts One or Two. *See, e.g.*, *id.* ¶¶ 66–67 (alleging that Defendants have denied liability to "provide benefits to eligible retirees and beneficiaries attributable to the Signatory Subsidiaries," requiring the Plan to do so in their stead); *id.* ¶ 74 (alleging that Defendants failed to post security of $15,632,220 for 2020).[9] Thus, EID's standing challenge—at least as to this argument—only concerns Count Three.[10]

As for Count Three, EID attacks the concreteness and imminence of Plaintiffs' asserted injury. But "[e]conomic harm . . . is a classic form of injury-in-fact." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015) (internal quotations omitted). And Defendants' refusal to contribute to the Plan as required by the Coal Act is such a harm. *See* ECF No. 32 ¶ 77. Still, EID argues that Plaintiffs will not suffer any actual injury from Defendants' failure to pay premiums because Congress has established a backstop to fund any unaccounted-for Plan benefits. ECF No. 95-1 at 26. Thus, according to EID, the Plan "can pay its obligations regardless of whether it wins or loses this case or receives any payment under the Coal Act from the Defendants (or derivatively, from EID)." *Id.* at 27.

---

[9] *See also generally Arch Coal*, 947 F.3d at 815 (A related person's "providing benefits to retirees of its former subsidiaries per [26 U.S.C] § 9711" is distinct from "paying premiums to the 1992 Plan per § 9712(d)(1)(A)," which is also distinct from "provid[ing] security pursuant to § 9712(d)(1)(B)."); *Holland v. CONSOL Energy Inc.*, No. 2:17-CV-2091 (TEJ), 2018 WL 4323928, at *5 (S.D. W. Va. Sept. 10, 2018) (suggesting that the plaintiffs would have had standing if there were an "allegation that Consol ha[d] failed to provide the requisite security to the 1992 Plan"), *aff'd*, 781 F. App'x 209 (4th Cir. 2019).

[10] EID also argues that the Plan caused itself injury because it returned over $10 million in security. ECF No. 95-1 at 29–30. This argument, admittedly, does address Count Two. As discussed below, however, that argument also fails.

To be sure, Congress has appropriated money to pay the Plan's unfunded obligations.  *See* 30 U.S.C. §§ 1232(i)(1)(B), 1232(h)(1)(B), 1232(h)(2)(B); 26 U.S.C. § 9712(d)(1)(C).[11]  Under this scheme, the Plan can request federal funds "in an amount equal to the difference between" two figures.  *See* 30 U.S.C. § 1232(h)(2)(B).  The first is the amount Plan trustees "estimate will be expended . . . during the next calendar year to provide the benefits required."  *Id.* § 1232(h)(2)(B)(i).  The second is the amount Plan trustees "estimate" the Plan "will receive during the next calendar year" in monthly premiums, realization of security already posted, and relevant payments from federal agencies.  *See id.* § 1232(h)(2)(B)(ii).  In short, the Plan can annually request its estimate of the difference between the upcoming year's cash outflows and inflows.  The Secretary of the Interior must then transfer that amount to the Plan "[a]s soon as practicable after the beginning . . . of each fiscal year."  *See id.* § 1232(h)(1)(B).  That amount is now uncapped. *See id.* § 1232(i)(3)(C).

Despite this funding transfer backstop, Plaintiffs still suffer a constitutional injury for at least two reasons: (1) these federal funding transfers will not necessarily cover Plaintiffs' entire economic injury; and (2) the difference in payment timing creates a separate cognizable injury.

First, even with the backstop of federal funding, there is a substantial risk that the Plan will not be made whole.  Plaintiffs' alleged injury is Defendants' failure to pay the Plan *premiums*. Thus, the scope of the injury is the sum of the premiums owed by Defendants.  The federal funding, however, does not promise to reimburse the premiums dollar for dollar.  So the Plan will not

---

[11] Congress provided for these funds in several Coal Act amendments including: the Surface Mining Control and Reclamation Act Amendments of 2006, Pub. L. No. 109-432, div. C, tit. II, § 202, 120 Stat. 2922, 3008 (Dec. 20, 2006); the Bipartisan American Miners Act of 2019 ("BAMA"), Pub. L. No. 116-94, div. M, § 102, 133 Stat. 2534, 3091 (Dec. 20, 2019); and the American Miner Benefits Improvement Act of 2020, Pub. L. No. 116-260, div. Y, 134 Stat. 1181, 2417 (Dec. 27, 2020).  The Court's description of the funding scheme pertains only to the present version of the statute.

necessarily receive the difference between the premiums it is owed and the premiums it expects to receive.  Instead, Congress only provides funds equal to the difference between the amount the Plan expects to *expend* and the premiums it expects to receive, over a year's time.  *See* 30 U.S.C. § 1232(h)(2)(B).  In other words, the Plan will only be reimbursed for its premium shortfalls up to the point where it can pay its expected expenditures during that year.  But if the Plan expects to receive *more* in premiums than it expects to expend that year, then the backstop does not kick in.  Thus, as Plaintiffs point out, the size of the backstop could decrease because of a decline in how much the Plan must pay out, even if the *premiums* Defendants allegedly must pay in stay the same.  *See* ECF No. 101 at 20.  And even if that difference turns out to be small, financial deprivation, no matter how slight, is a constitutional injury.  *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

EID ignores this distinction by arguing that even if the Plan might receive *more* money from the premiums than the federal funds, those federal transfers will enable it to "pay its obligations regardless of whether it wins or loses this case."  ECF No. 95-1 at 27.  But the relevant question is not whether the Plan can pay its obligations in a given year—it is whether the Coal Act gives the Plan something just as beneficial to Plaintiffs as what they argue Defendants are on the hook for.  *See Holland v. Murray*, No. 21-cv-567 (TJK), 2023 WL 2645708, at *4 (D.D.C. Mar. 27, 2023) (rejecting an analogous argument by comparing the relief sought with the asserted alternative benefit); *Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) (Evaluating standing at the pleading stage requires an assumption that "the party asserting federal jurisdiction is correct on the legal merits of [its] claim.").

Second, even aside from any disparities between the federal transfers and the premiums Defendants allegedly owe, the timing of the payments is another source of Plaintiffs' constitutional

12

injury.  As this Court has explained in a similar context, "money has time value" and so "delay in . . . receipt of [money] . . . is an actual, tangible pecuniary injury."  *See Holland*, 2023 WL 2645708, at \*4 (quoting *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019)). Here, any backstop in federal funding the Plan might receive will be delayed as compared to the premiums it is allegedly owed because the "[p]remiums are due monthly, whereas the amount of federal funds to be transferred . . . is determined annually."  *See* ECF No. 101 at 21.  Indeed, the federal transfer is not subject to any specific due date; it must only be sent "[a]s soon as practicable after the beginning of [each] fiscal year."  *See* 30 U.S.C. § 1232(h)(1)(B).  Plaintiffs claim that Defendants have already failed to pay more than $30 million in premiums.  *See* ECF No. 101 at 13.[12]  And as they point out, if those shortfalls are not "immediately covered, . . . the Plan will be deprived of money for some period," even if those losses could eventually be recovered.  *See id.* at 21.  Thus, even assuming all the Plan's losses in premiums are recoverable via federal funding, the delay in receipt of those federal funds is a separate, concrete injury in fact.

EID does not meaningfully address this issue.  Instead, it argues that Plaintiffs did not adequately allege a time-value-of-money injury in their complaint and may not now clarify the nature of their injuries in response to a motion to dismiss.  *See* ECF No. 104 at 12–13.  Not so. Plaintiffs have alleged that Defendants' failure to pay the premiums will cause them injury, and that is sufficient.  Moreover, the possibility that the Plan will receive federal funds later than the premiums is a reasonable inference from their allegations.  Plaintiffs claim that Defendants "are required to pay [the Plan] a monthly per beneficiary premium," ECF No. 32 ¶ 77, while the timing of the federal transfers is specified in the Coal Act; the mismatch is therefore readily apparent.

---

[12] "Because [the third-party] defendants challenge [the] plaintiffs' standing here, the Court may look to matters outside the pleadings . . . ."  *Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 224 (D.D.C. 2017), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018).

EID effectively asks the Court to blind itself to the clear implications of Plaintiffs' allegations as compared to the relevant legal framework. *See Coal. for Underground Expansion*, 333 F.3d at 198 (noting that the Court can consider "undisputed facts evidenced in the record" in evaluating a motion under Rule 12(b)(1)). Thus, contrary to EID's suggestion, Plaintiffs argument that part of their injury stems from the timing of the payments is not "wholly disconnected from the allegations" in its complaint. *See W. Virginia Ass'n of Cmty. Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1574 n.5 (D.C. Cir. 1984) (explaining that "it is not necessary that [a plaintiff] plead their injury in terms of a legal conclusion" so long as they "adequately pleaded the facts giving rise to their injury"). And to the extent EID rejects the possibility that the transfer's timing will disadvantage the Plan, that "wrongly assumes facts in [its] favor at the complaint stage." *See In re OPM*, 928 F.3d at 65.

EID also questions whether any injury is imminent. Plaintiffs have sufficiently alleged an "ongoing or future injury" that is "certainly impending" and has a "substantial risk" of occurring. As already explained, so long as Defendants refuse to pay the premiums, Plaintiffs are subject to financial injury from both the potential difference between the premiums owed and the federal funding received, and from the delay in receipt between the monthly premiums as compared to the annual appropriations. This is not the kind of conjectural harm that might "only occur through the happening of a series of contingent events" that courts have traditionally found insufficient for standing. *See Attias*, 865 F.3d at 628 (referencing *Clapper*, 568 U.S. at 410–14). The harm does not, for example, depend on a "series of independent actors . . . exercis[ing] their independent judgment in a specific way." *Id.* Rather, Defendants' refusal to pay premiums, on its own terms, creates a substantial risk of continuing future financial harm. Thus, Plaintiffs have plausibly alleged an injury-in-fact.

Neither *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), nor *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020), cited by EID, is to the contrary.  *Contra* ECF No. 95-1 at 27–28.  True, the Court in *Ramirez* reaffirmed that Congress cannot simply pronounce an injury concrete and thereby satisfy Article III.  *See* 594 U.S. at 425–30.  But it also recognized that the "most obvious" concrete injuries are "traditional tangible harms, such as . . . monetary harms."  *See id.* at 425.  And as the Court has just explained, Plaintiffs face a substantial risk of monetary harm.  As for *Thole*, EID disregards the critical difference between claims brought by a plan and claims brought by its beneficiaries.  In *Thole*, the Court confronted the latter.  *See* 140 S. Ct. at 1620.  A beneficiary of a defined-benefit plan receives "fixed" benefits that do "not change, regardless of how well or poorly [a] plan is managed."  *Id.*  Thus, as the *Thole* Court explained, alleged mismanagement that does not plausibly threaten a plan's ability to pay those benefits does not concretely harm beneficiaries.  *See id.* at 1619–20.  But as this Court explained in *Murray*, "[t]hat case says nothing about injuries to plans themselves."  2023 WL 2645708, at *4.

## 2.  Plaintiffs' Injury Is Not Self-Inflicted

In the alternative, EID argues that even if the Plan is injured, any such injury is self-inflicted and cannot therefore support Article III standing.  *See* ECF No. 95-1 at 29.  No doubt, self-inflicted injuries—those created by the choice a plaintiff makes rather than the actions of a defendant—do not qualify as injuries-in-fact.  *See Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996).  EID says that principle is relevant here because, as part of a settlement arising from Murray Energy's bankruptcy, the Plan returned $10 million in security.  *See* ECF No. 95-1 at 16; 29–30.  EID characterizes that act as self-infliction of the security-related injury Plaintiffs assert.  *See* ECF No. 104 at 21.

For starters, this argument addresses only Plaintiffs' claim for security, so it could only

apply to Count Two. But even if the argument were otherwise sound—and the Court does not suggest that it is—it anyway covers only $10 million.[13] Yet according to Plaintiffs, Defendants owe the plan $15,632,220 in security, well more than what EID contends the plan returned. ECF No. 32 ¶ 74. So Plaintiffs would retain a qualifying injury under Count Two even if a portion of the Plan's security-related damages is self-inflicted.[14]

### 3.  The Third-Party Complaint's Claims are Constitutionally Ripe

RWE also asserts a jurisdictional challenge against the Third-Party Complaint. It argues that based on the contingent nature of Defendants' third-party claims, they are constitutionally unripe. *See* ECF No. 112-1 at 15–16. Not so.

The Court is doubtful that the doctrines of constitutional standing and constitutional ripeness are distinct. *Cf. Trump v. New York*, 141 S. Ct. 530, 535–37 (2020) (describing the doctrines as "related" and finding it unnecessary to distinguish between them). In any event, a future injury that is imminent enough to confer standing will always satisfy the ripeness standard. *Nat'l Treasury Emps. Union*, 101 F.3d at 1428. That is the case here.

RWE points out that Defendants base their contribution claim on "perceived damages" that are "entirely contingent and hypothetical" on "future events"—"namely whether Plaintiffs prevail

---

[13] Although it need not decide the issue, the Court is skeptical that EID's argument has merit because Defendants are allegedly jointly and severally liable for Murray Energy's Coal Act obligations, irrespective of any settlement between Murray Energy and the Plan. 26 U.S.C. § 9712(d)(4); *cf. Arch Coal*, 947 F.3d at 819–20 (holding that a company's Coal Act "related person" obligations were not satisfied by the proceeds of a letter of credit that had been provided to the Plan on behalf of the company's subsidiaries).

[14] The $10 million in security that the Plan supposedly returned also does not come close to the more than $30 million in premiums that, according to Plaintiffs, Defendants owe the Plan. ECF No. 101 at 13, 23. But as already explained, the security and premiums owed under the Coal Act are distinct. *See Arch Coal*, 947 F.3d at 815. Thus, any satisfaction of Defendants' security obligations (or any self-injury as to security), would not satisfy (or eliminate) Defendants' separate premium obligations.

in the underlying declaratory judgment action against Defendants." *See* ECF No. 112-1 at 15–16

(quotation omitted).  But in arguing that this makes the Third-Party Complaint defective, RWE

disregards Rule 14.  As a leading federal-courts treatise puts it:

> Rule 14 allows [a] defendant to implead one "who . . . may be liable" to the third-
> party plaintiff for all or part of the plaintiff's claim against it.  The words "may be
> liable" mean that defendant is permitted to join someone against whom a cause of
> action has not yet accrued, provided that the claim is contingent upon the success
> of plaintiff's action and will accrue when defendant's liability is determined in the
> main action or plaintiff's claim is satisfied.  In this context, resort to impleader has
> the effect of accelerating the determination of the third-party defendant's liability.

6 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1451, Westlaw (3d ed.)

(database updated Apr. 2023) (footnote omitted).

Thus, the "problematic" feature of the Third-Party Complaint that RWE identifies is actu-

ally quite ordinary.  "The vast weight of authority sides with the position that inchoate claims for

contribution may be brought under Rule 14." *Millers Cap. Ins., Co. v. Hydrofarm, Inc.*, 340 F.R.D.

198, 217 n.10 (D.D.C. 2022) (quotation omitted); *see also, e.g.*, *Hecht v. Summerlin Life & Health

Ins. Co.*, 536 F. Supp. 2d 1236, 1241 (D. Nev. 2008) (permitting similarly contingent third-party

claims to go forward in an ERISA case).  To the extent there is any tension between this well-

accepted authority and principles of standing or ripeness, it remains true that those principles have

not been applied to constitutionally invalidate claims brought under Rule 14's explicit text.[15]

Thus, the Court declines to break new ground on this question.  Like the injury at issue in

*Millers Capital Insurance*, Defendants' asserted injury is "essentially imminent" because it will

materialize, if at all, in this very action.  *See* 340 F.R.D. at 215 (citation omitted).  So the Court

---

[15] *See Millers Cap. Ins.*, 340 F.R.D. at 215 ("[T]here is no evidence that the [Supreme] Court, the Judicial Conference, or Congress—all of whom hold the pen to the Federal Rules of Civil Procedure—have ever recommended altering Rule 14 (such as by removing the words 'may be liable') to reconcile the rule with the Court's standing jurisprudence.").

finds no jurisdictional barrier to Defendants' Third-Party Complaint, and it will deny RWE's motion to dismiss as far as it asserts a lack of subject-matter jurisdiction for this reason.

**B.      Neither EID nor RWE is a Related Person under the Coal Act**

Having established that the Court has subject-matter jurisdiction over this action, it now turns to whether the Third-Party Complaint states a claim. EID and RWE both argue that they are not "related person[s]" under 26 U.S.C. § 9701(c)(2) and therefore cannot be liable for Consolidation's obligations under the Coal Act. *See* No. 95-1 at 40–45; ECF No. 112-1 at 24–28. They are right.

The Coal Act provides that any "related person" to a last signatory operator is jointly and severally liable for that operator's obligations to the plan. *See* 26 U.S.C. § 9712(d)(4). A "related person" to a last signatory operator is any person (or successor in interest of such person) that, as of July 20, 1992, (1) was "a member of the same controlled group of corporations" as the last signatory operator; (2) was "a trade or business which is under common control" with the last signatory operator; or (3) had a "partnership interest or joint venture with a signatory operator in a business within the coal industry" and that "employed eligible beneficiaries." *Id.* § 9701(c)(2)(A). Defendants have not sufficiently alleged that EID or RWE fit into any of these three categories.

First, Defendants neither allege nor argue that EID or RWE are "related persons" as a "trade or business under common control" with Consolidation under 26 U.S.C. § 9701(c)(2)(A)(ii).

Second, Defendants *do* allege in the Third-Party Complaint that EID and RWE "are part of the same controlled group" as Consolidation—"to the extent Defendants are—"and thus are related persons as defined by the Coal Act." *See* ECF No. 82 ¶ 47 (citing 26 U.S.C. § 9701(c)(2)). But they do not explain why. A "controlled group of corporations" can be a "parent-subsidiary group," a "brother-sister controlled group," or a "combined group." *See* 26 U.S.C. § 1563(a)(1)–

(3).  To state a claim under this theory, Defendants must plead facts that permit the Court to infer which of those group types is present here.  *Cf. Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 610 (E.D.N.Y. 2017) (requiring such facts at the default-judgment stage).  Here, the Court has nothing besides Defendants' proffered legal conclusion, which is not enough.  *See Trudeau*, 456 F.3d at 193; *Iqbal*, 556 U.S. at 663–64.

Besides, Defendants do not even attempt to defend that legal conclusion in response to EID's and RWE's motions to dismiss.  "It is well understood in this Circuit that . . . an opposition to a motion to dismiss addressing only certain arguments raised by the [movant]" permits the Court to "treat [unaddressed] arguments . . . as conceded."  *Hill v. Garland*, No. 19-cv-3389 (JEB), 2021 WL 965624, at *6 (D.D.C. Mar. 15, 2021) (citation omitted).  Rather than argue that EID and RWE are in the same controlled group as Consolidation, Defendants pivot to arguing that "there are additional types of related persons under the Coal Act *other than* as a member of a controlled group of corporations with a signatory subsidiary."  ECF No. 102 at 21 (emphasis added); *see also* ECF No. 123 at 21–22 (relying on the argument only that RWE and EID had a joint venture under Section 9701(c)(2)(A)(iii), but not explaining how RWE or EID were in the same controlled group as a signatory subsidiary under Section 9701(c)(2)(A)(i)).  The Court therefore treats as conceded the argument that Defendants have failed to sufficiently allege a "controlled group" theory.

Third and finally, Defendants argue that EID and RWE are "related persons" based on their joint venture.  *See* ECF No. 102 at 21.[16]  However, the joint venture between EID and RWE was

---

[16] It is not clear whether Defendants properly alleged this theory in the Third-Party Complaint.  True, Defendants allege that EID and RWE "form[ed] a joint venture" and that they "were members or owners of a joint venture."  ECF No. 82 ¶¶ 31, 46.  But they do not allege that either EID or RWE is a "related person" *because of that joint venture.*  The sole "related person" allegation in the Third-Party Complaint is that EID and RWE "are part of the same controlled group," which refers to language from 26 U.S.C. § 9701(c)(2)(i)—not (iii).  *Id.* ¶ 47.  Defendants rely on

not "*with* a signatory operator" and so cannot give rise to "related person" liability under 26 U.S.C. § 9701(c)(2)(A)(iii) (emphasis added).  Defendants allege that, in 1991, EID and RWE formed a joint venture with each other.  *See* ECF No. 82 ¶ 31.  To do so, EID and its subsidiary sold half of their 100 percent interest in Consolidation and formed Old CONSOL.  *Id.* ¶¶ 31–32.  Consolidation then "became Old CONSOL's subsidiary."  *Id.* ¶ 32.  The Court thus understands the corporate structure of the joint venture on the relevant date to resemble the following:



As this illustration shows, EID and RWE were not in a joint venture "with" Consolidation, the signatory subsidiary.  *See* 26 U.S.C. § 9701(c)(2)(iii).  Rather, EID and RWE entered into a joint venture *with each other*.  *See* ECF No. 82 ¶ 31; *see also* ECF No. 102 at 21 (arguing that EID "was in a joint venture *with* RWE . . . to own Consolidat[ion]" (emphasis added)).[17]  And neither that joint venture, nor the resulting corporate entity (Old CONSOL) was itself a last signatory operator.  Thus, Defendants fail to allege an essential element of liability.

Defendants try to evade the Coal Act's plain text by citing *Holland v. High Power Energy*, 98 F. Supp. 2d 741 (S.D. W. Va. 2000).  That case is inapposite.  There, the plaintiffs alleged that

---

the joint venture theory of relatedness for the first time in their responses to EID's and RWE's motions to dismiss.  *See* ECF No. 102 at 21–23; ECF No. 123 at 21–22.  The Court need not decide whether this pleading defect warrants dismissal because, as discussed below, the joint venture theory fails anyway, even as described in their briefing.

[17] Defendants' brief refers instead to "Consolidated Coal."  ECF No. 102 at 21.  The Court assumes they intended to refer to Consolidation, as "Consolidated Coal" is not a corporate entity referenced anywhere in any operative pleading.

one of the defendants—Pratt—was a "related person" to the relevant signatory operator, High Power. *Id.* at 743. Pratt pushed back, at least as to § 9701(c)(2)(A)(iii), arguing that it "did not form a joint venture with High Power, but rather formed High Power as a joint venture *with Geupel*," a separate company. *Id.* at 744–45 (emphasis added). Thus, the corporate structure in that case, per Pratt, looked like this:



The *High Power* court rejected Pratt's argument because, though "the statute could be read" that way, it thought "[s]uch a reading . . . too narrow and restrictive." *Id.* at 745. Lacking definitions of "partnership" and "joint venture" in the Coal Act itself, the court turned to guidance in the Internal Revenue Code and in West Virginia law. *Id.* It found under both that a member in a joint venture is the equivalent of a partner in a partnership. *Id.* at 745–46. And it was "undisputed that Pratt [held] a 25% interest in the High Power joint venture." *Id.* at 746. Applying those principles, the court held that "Pratt, as a member of the High Power joint venture, ha[d] the equivalent of a 25% general partnership interest in and 'with' the joint venture or partnership of High Power, the last signatory operator, and [was] a related person, with joint and several liability, as defined under § 9701(c)(2)(A)(iii) of the Coal Act." *Id.*

Even assuming the Court agreed with *High Power*'s analysis, based in part on West Virginia law, the alleged corporate relationships here are materially different.[18] For *High Power* to

---

[18] The Court also notes its skepticism of the reasoning in *High Power*. The court there explained that "having a partnership interest or joint venture" under § 9701(c)(2)(A)(iii) means being a member of an organization "through or by means of which any business, financial operation, or venture is carried on." *High Power Energy*, 98 F. Supp. 2d at 744–45. High Power was the company formed by the joint venture, but it was not a member of the joint venture itself. Indeed, between Pratt's 25% interest in the joint venture and Geupel's 75% interest, there was no interest left for High Power to own. *Id.* at 743. Thus, Pratt did not have a joint venture "with"

be analogous, Defendants would have had to allege that (1) EID and RWE formed a joint venture "in and 'with'" Old CONSOL, *and* (2) that Old CONSOL was a last signatory operator. *See High Power*, 98 F. Supp. 2d at 746. But at most, Defendants' allegations show only the first condition. *See* ECF No. 82 ¶ 32. On the second, their argument that EID "had a 50% ownership interest 'in and with' the joint venture *that owned the alleged signatory operator*, Consolidation," confirms that Defendants go one step further than even *High Power* would allow. *See* ECF No. 102 at 22 (emphasis added). Ultimately, Old CONSOL (the joint venture) itself, not EID or RWE, owned Consolidation, the signatory subsidiary. Thus, EID and RWE did not form a joint venture "with" Consolidation, even if, under the logic of *High Power*, they were in a joint venture "in and 'with'" Old CONSOL.

Defendants point to the Court's earlier opinion in which it found Plaintiffs' "related person" allegations enough to state a claim. They suggest that the "related person" allegations in the Third-Party Complaint are like those in Plaintiffs' complaint. ECF No. 123 at 20. Not so. Defendants ignore that the Court's earlier conclusion depended on its view that, "[s]o long as any of the[ ] . . . routes to 'related person' status for each of these defendants *is supported by factual allegations that make that* [*route*] *plausible*, Plaintiffs have stated a claim that they each qualify as 'related persons.'" *Holland v. Consol Energy Inc.*, No. 20-cv-1148 (TJK), 2022 WL 910347, at *8 (emphasis added). And the Court found that Plaintiffs' "modest factual allegations suffice." *Id.* But here, Defendants' allegations on this point are not even modest—they do not exist. The only relevant allegation about EID's and RWE's "related person" status—the joint venture theory—does not plausibly allege facts sufficient to meet the requirements of 26 U.S.C.

---

High Power, but instead "with" Geupel "in" High Power. But the definition of a "related person" under § 9701(c)(2)(A)(iii) only extends to a person who has a joint venture "with" a signatory operator, not "in" a signatory operator.

§ 9701(c)(2)(iii).  Instead, as explained above, those allegations confirm that neither EID nor RWE are related persons under any path outlined in 26 U.S.C. § 9701(c)(2).  As a result, the Court will grant EID's and RWE's motions to dismiss for failure to state a claim.

**IV.    Conclusion and Order**

For all these reasons, it is hereby **ORDERED** that EID's and RWE's motions to dismiss the Third-Party Complaint, ECF Nos. 95 and 112, are **GRANTED**.  It is further **ORDERED** that Defendants' Third-Party Complaint, ECF No. 82, is **DISMISSED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 23, 2024